

**SIGNED this 02nd day of October, 2012.**

_____
**LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

**Western District of Texas
San Antonio Division**

| IN RE: | BANKR. CASE NO. |
|---|---|
| ANTONIO DELUNA, JR. & BARBARA JANE DELUNA | 11-53444-C |
| *DEBTORS* | CHAPTER 13 |

## MEMORANDUM OPINION

This is a chapter 13 case involving debtors who want to keep making car lease payments outside the plan for one of their vehicles, as a long term debt. *See* 11 U.S.C. § 1322(b)(5). The vehicle is a 2011 Chevrolet Traverse, with a monthly payment of $677.[1] The debtors have three school age children and Mrs. DeLuna, who does not work, uses the vehicle primarily for ferrying the children, buying groceries, and the like. Mr. DeLuna drives a 2006 Ford Explorer, the

---

[1] The lease is shown as being paid to Tony and Virginia DeLuna, the debtor's parents. They are the actual obligors on the lease, and the debtors repay them monthly.

payments for which are in the plan. The portion of the plan payment attributable to the remaining debt on this vehicle is just $59 a month. Mr. DeLuna requires a vehicle for his work as rental coordinator for an equipment company.

The chapter 13 trustee in this case urges the court not to confirm the Debtors' chapter 13 plan, claiming that the vehicle lease payment of $677 for the Chevrolet Traverse exceeds the amount reasonably necessary for a vehicle for the debtors. The trustee argues that the Debtors could obtain some other form of transportation for family use, with a monthly payment that would be substantially less.[2] The trustee says that these debtors, who are above median income, should only be permitted a monthly car payment of no more than $500. The trustee relies on §1325(b)(3), which in turn incorporates the means test expenses standards in §707(b)(2). More specifically, the trustee believes that the IRS standards referenced in §707(b)(2)(A)(ii) apply to limit the total amount allowed to debtors for car payments, and that a monthly car payment of $677 is not an "amount reasonably necessary to be expended" because it exceeds that amount. *See* 11 U.S.C. § 1325(b)(3). The only issue before this Court is whether the Chapter 13 plan should be confirmed given this objection.[3]

## *ANALYSIS*

### *I. Congress' Intent and the Confirmation of the Plan in Chapter 13.*

The policy behind the enactment of Chapter 13 of the Bankruptcy code was "to encourage more debtors to repay their debts over an extended period rather than to opt for straight bankruptcy liquidation and discharge" and "to permit almost any individual with regular income to propose and have accepted a reasonable plan for debt repayment based on that individual's exact circumstances." H.R. Rep. No. 595, 95th Cong. 1st Sess. 5 (1977); S. Rep. No. 989, 95th Cong. 2d Sess. 13 (1978); *In re Hobday*, 4 B.R. 417, 419 (Bankr. N.D. Ohio 1980). Barring objection from the trustee or the holder of an allowed unsecured claim under Section 1325(b), the Debtor in Chapter 13 need only meet the requirements set out in Section 1325(a) of the Bankruptcy Code in order for a plan to be confirmed. *See* 11 U.S.C. § 1325(a). The bankruptcy court cannot impose any additional requirements for confirmation that are not already specifically listed in § 1325(a) – not even under the equitable power of § 105(a) -- because, "absent exceptional circumstances, to permit a bankruptcy court to exercise undefined equitable powers to supplement the requirements of § 1325(a) would alter that section beyond the scope that Congress intended, transforming the finite list of requirements a debtor must meet to receive bankruptcy protection into a potentially infinite list." *Petro v. Mishler*, 276 F.3d 375, 378 (7th Cir. 2002). Thus, if there is a basis for sustaining the trustee's objection to this plan, it must be grounded in the provisions of the statute itself. Otherwise, this court risks engrafting new requirements for chapter 13 confirmation never envisioned by Congress, an especially

---

[2] No evidence was presented on what sort of vehicle would in fact be available to the debtors were they go out into the marketplace post-petition to find reliable transportation for this purpose.

[3] The court ruled on the record that the plan could be confirmed. This decision memorializes the court's reasoning.

inappropriate thing to do if the impact is to discourage families from repaying their debts in chapter 13 and instead to encourage them to discharge their debts in chapter 7. *See* House Report, *supra*.

## II. "Best Efforts" Requirement under § 1325(b).

When the trustee or the holder of an allowed unsecured claim objects to confirmation of a plan on grounds that the debtor is not using his "best efforts" to repay his creditors, Section 1325(b) comes into play. That section requires either that (1) the plan pay unsecured claims in full with interest or (2) commit all of the debtor's "projected disposable income" to such payments for the "applicable commitment period." 11 U.S.C. § 1325(b)(1). Section 1325(b)(2) defines "disposable income" as "current monthly income received by the debtor…less amounts *reasonably necessary* to be expended for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2) (emphasis added). If the Chapter 13 debtor's income is greater than the applicable "median family income," then section 1325(b)(3) comes into play, specifically setting the debtor's support needs to the standards referenced in section 707(b)(2)(A) and (B). 11 U.S.C. §1325(b)(3); *In re Tranmer*, 355.B.R. 234 (Bankr. D. Mont. 2006) ("If a debtor's annual income exceeds the median family income in her state, then the debtor's expenses must be determined in accordance with the means test in 11 U.S.C.S. § 707(b)(2)"). As a general proposition, "[t]he standard need not relate to the debtor's former life-style or status in society. However, in making the necessary factual determination, the court should not require drastic changes in the debtor's life or substitute its own values for those of the debtor regarding fundamental aspects of the debtor's life." *In re Bien*, 95 B.R. 281, 283 (Bankr. D. Conn. 1989). That said, section 1325(b)(3) specifically supersedes the more general provisions of section 1325(b)(2) when it comes to above median debtors. Thus, while a more generic "totality of the circumstances" test applies to the interpretation of what counts as "reasonably necessary" under section 1325(b)(2), the more specific provisions of section 707(b)(2)(A) and (B) apply when considering what counts as "reasonably necessary" for above-median debtors.

## III. The Above-Median Income Debtor and §707(b)(2)(A)(ii).

The trustee's argument presumes that Section 707(b)(2)(A)(ii) is the relevant subclause controlling the question presented in this case. That presumption is not correct, however. It is true that subclause (ii) addresses "reasonably necessary" monthly expenses. Significantly, however, that section expressly *excludes* any payments for debts: "Notwithstanding any other provisions of this clause, the monthly expense of the debtor shall *not* include any payments for debts." *See* 11 U.S.C. § 707(b)(2)(A)(ii)) (emphasis added). Thus, while it is true that subclause (ii) incorporates certain IRS standards that happen in turn to address the maximum amount those standards allow for a car payment[4], those provisions are superseded by the express exclusion of

---

[4] The Internal Revenue Service established Local Standards for transportation and housing costs primarily for the purpose of setting up tax repayment programs for taxpayers. For example, Transportation Expense Standards issued by IRS for taxpayers with a vehicle consists of two parts: (1) nationwide figures for monthly loan or lease payments

any payments for debts in § 707(b)(2)(A)(ii)(I). *See Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 384-385 (1992) ("It is a commonplace of statutory construction that the specific governs the general."). Thus, we must look elsewhere for guidance regarding how much a debtor is allowed under section 707(b)(2) for debt repayment. And sure enough, there is a separate subclause for that very purpose – subclause (iii).

*IV. The Above-Median Income Debtor and §707(b)(2)(A)(iii).*

Section 707(b)(2)(A)(iii) addresses how much a debtor is allowed, under the means test, to deduct making average monthly payments on account of secured debts. *See* 11 U.S.C. § 707(b)(2)(A)(iii). Section 707(b)(2)(A)(iii) is a "stand-alone clause that does not require secured debts to first qualify for deduction under clause (ii)" because Section 707(b)(2)(A)(i) expressly provides that, in calculating whether the debtor has sufficient net income to pay unsecured creditors at least 25% over 60 months, the debtor's current monthly income is to be reduced by the amounts determined under clauses (ii), (iii), *and* (iv). *In re Owsley*, 384 B.R. 739, 746 (Bankr. N.D. Tex. 2008); 11 U.S.C. § 707(b)(2)(A)(i) (emphasis added). Thus, subclause (iii) is an allowed deduction that stands independent of subclause (ii).

The term "secured debts" is not specifically defined in the Bankruptcy Code. In general, it may be said that "an obligation will constitute a 'secured debt' only if it may be considered both a 'debt' and 'secured.'" *McVay v. Otero*, 371 B.R. 190, 195 (W.D. Tex. 2007); *see Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860, 106 S. Ct. 1600, 89 L. Ed. 2d 855 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning."). In the Bankruptcy Code, the meanings of "debt" and "claim" are considered to be "coextensive." *McVay*, 371 B.R. at 195; *Penn. Dept. of Public Welfare v. Davenport*, 495 U.S. 522, 558, 110 S. Ct. 2126, 109 L.Ed.2d 588 (1990); *In re Rifkin*, 124 B.R. 626, 628 (Bankr. E.D. Pa. 1991) ("Debt and claim are flip sides of the same coin.").

However, "debt" views claim from the point of view of the debtor making the payment, while "claim" views the debt from the point of view of the creditor who expects to receive payment. The point of view is important because section 506(a) uses the expression "secured claim" (or more accurately, "a claim is secured …"). Section (506(a) is thus highly relevant to how a *claim* that is secured may be treated in bankruptcy – namely, a claim that is secured may be bifurcated, so that the creditor whose collateral is worth less than the total indebtedness holds

---

referred to as ownership costs and (2) additional amounts for monthly operating costs broken down by Census Region and Metropolitan Statistical Area. If a taxpayer has a car payment, the allowable ownership cost added to the allowable operating cost equals the allowable transportation expense. Under Transportation Expense Standards, the "Ownership Costs"—which provide maximum allowances for the lease or purchase of two automobiles if allowed as a necessary expense—is $496 per vehicle. The "Operating Costs"—which provide maximum allowance for maintenance, repairs, insurance, fuel, registrations, licenses, inspections, parking and tolls—is $244 for South Region, including San Antonio. *See* IRS Local Transportation Expense Standards, available at http://www.justice.gov/ust/eo/bapcpa. The standards were not promulgated with the Bankruptcy Code in mind.

*two* claims, one measured by the value of the collateral, and the other measured by whatever of the debt remains in excess of that value. Section 506(a) is *not* so relevant, however, to the question presented in section 707(b)(2)(A)(iii) – payments on account of "secured debts." In this context, bifurcation is not at issue. Payments *on account of* "secured debt" are not affected in any way by the operation of section 506(a). Instead, our focus is on the liability from the point of view of the *debtor*. And in that context, we may describe some liabilities as secured, and some liabilities as unsecured, depending on whether there is collateral standing for the debt. *McVay* reaches this conclusion as well, stating that a secured debt is a debt "secured by a lien on property in which the debtor's estate has an interest." *See McVay*, 371 B.R., at 195.[5] Thus, what matters is not so much the *extent* of security but the *fact* of security for the debt. This observation is buttressed by the language in subclause (I), which directs that payments on account of secured debts be calculated as the sum of "the total of all amounts *scheduled* as *contractually* due to secured creditors …" 11 U.S.C. § 707(b)(2)(A)(iii)(I).[6]

It is not entirely clear that the debt in this case should actually be treated as "secured debt" for at least two reasons. First, the debt is self identified as a "vehicle lease." Second, it appears that the actual obligors on the lease may well be the debtors' parents, rather than the debtors. If the debt in question is not actually a "secured debt" then it can be argued that subclause (iii) does not apply. And if the vehicle lease is actually in the name of the parents, then it can be argued that the debtors have no obligation to make any payments at all, because they do not directly owe on the vehicle lease. No evidence of the underlying lease was ever presented, so it is impossible to know whether the debtors are or are not in fact co-obligors, and it is similarly impossible to verify whether this vehicle lease retains a security interest (as many do). Without this evidence, the burden of production for which lay with the debtors, the court elects to conclude that the debt is not a "secured claim" for purposes of section 707(b)(2)(A)(iii).

## V. The Above-Median Debtor and 707(b)(2)(A)(ii) -- again

Unfortunately for the debtors, the same "notwithstanding" sentence that first sent us looking to subclause (iii) imposes a substantial hurdle for otherwise deducting this payment for purposes of calculating disposable income under section 1325(b)(3). Recall again what the sentence says: "notwithstanding *any other provision* of this clause, the monthly expenses of the

---

[5] The *McVay* court took a detour into section 506(a), based on its conclusion that the terms "debt" and "claim" are coterminous. *See id.* This court does not disagree with this point as a general proposition, but notes that Congress did choose to use both terms in the Code, and is presumed to have done so for a reason. The analysis in this decision suggests such a reason, namely, the relevance of point of view in different parts of the Code. Thus, we measure eligibility in terms of debts, but we measure confirmation on the basis of treatment of claims.

[6] Section 707(b)(2)(A)(iii) allows a debtor to deduct the average monthly payments on account of secured debts, calculated as the sum of (1) "the total of all amounts scheduled as contractually due to secured creditors" and (2) "any additional payments to secured creditors necessary for the debtor to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts." 11 U.S.C. § 707(b)(2)(A)(iii)(I) & (II). It is generally understood that § 707(b)(A)(iii)(I) refers to ongoing payments on secured debt, whereas § 707(b)(A)(iii)(II) refers to payments to cure arrearages on secured debt. *Baud*, 634 F.3d at 348.

debtor *shall not include* any payments for *debts*." 11 U.S.C. § 707(b)(2)(A)(ii)(I). The "any other provision" of the clause could conceivably include payments on otherwise ordinary unsecured debts. For example, a debtor might have paid for her groceries using her credit card. She will be permitted to take an allowance for groceries, to the extent allowed by the statute, but she will not be permitted to deduct the credit card payments she is making for groceries she bought using her card. The rationale is simple. The purpose of the means test is to find out how much, if anything, will be *left over* after one's living expenses to pay unsecured debts. If one were to deduct the payments one is already making on those debts, the means test would falsely show that the debtor cannot afford to repay those very debts![7]

This leaves these debtors in a quandary. Payments for debts are not allowed deductions, unless the debts are secured debts. There is no special provision for the payment of lease obligations in section 707(b)(2). Thus, we must return to the provisions of subclause (ii) to see whether the debtors can retain this vehicle pursuant to the IRS National and Local Standards.

The analysis under Section 707(b)(2)(A)(ii)(I) is straightforward. Section 707(b)(2)(A)(ii)(I) provides in pertinent part that "the debtor's monthly expenses *shall be* the debtor's *applicable monthly expense amounts specified* under the National Standards and Local Standards…issued by the Internal Revenue Service for the area in which the debtor resides." 11 U.S.C. § 707(b)(2)(A)(ii)(I) (emphasis added). As noted in part III, those *applicable monthly expense amounts specified* under the IRS Local Standards for car payments are (1) $496 per vehicle for the ownership costs and (2) $244 per vehicle for the operating costs, including maintenance and repairs. *See* IRS Local Transportation Expense Standards, *supra*. Section 1325(b)(3) provides a clear intention of Congress that bankruptcy courts are not permitted to exercise discretion to determine the reasonableness of expenses for above-median income debtors, except to the extent expressly allowed in Section 707(b)(2)(A)(ii) or a debtor demonstrates special circumstances that justify additional expenses under Section 707(b)(2)(B). *See* 11 U.S.C. § 707(b)(2)(A) & (B); *Baud v. Carroll*, 634 F.3d 327, 348 (6th Cir. 2011). In this case, a monthly car payment of $677—which the Debtors list in their amended Schedule J as "vehicle lease payments"—can be bifurcated into two parts: first, $496, which represent maximum allowance for the ownership costs; second, $181, the remainder of $677 that represents the operating costs.[8] Thus, a monthly car payment of $677 is an "amount reasonably

---

[7] Here's a quick example. Debtor has $3,000 in monthly income, and $2,500 in allowable expenses, leaving $500 a month to repay unsecured nonpriority debt. Debtor owes $30,000 on an unsecured loan. $500 a month is more than enough to repay at least 25% of that $30,000. Now suppose the debtor, in figuring allowable expenses, also deducts the $400 a month payment the debtor regularly makes on that $30,000 loan. Now there is only $100 a month left, not enough to pay at least 25% to that very same creditor. The debtor would thus be allowed to file chapter 7, even though she could clearly repay the $30,000 loan in chapter 13. Thus, payments on debts are not included in subclause (ii). We need not further discuss here the independent basis for allowing the payment of *secured* debts, provided in subclause (iii).

[8] On the record, the Debtors' counsel represented that there is an extended warranty and maintenance agreement that covers the vehicle throughout the life of the plan. Thus, it is reasonable to assume that a certain portion of this monthly payment of $677 represents the cost of maintenance and warranty coverage.

necessary to be expended" under Section 1325(b)(3) because it does not exceed the total amount allowed to debtors for car payments under the IRS standards referenced in §707(b)(2)(A)(ii). This Court need not engage in an analysis of what is reasonably necessary or consider special circumstances in this case. Accordingly, the trustee's objection is overruled and the Plan will be confirmed.

      A separate order confirming the plan has been entered.